1  JAMES ANDREW HINDS, JR. (SBN 71222)
   jhinds@jhindslaw.com
2  PAUL R. SHANKMAN (SBN 113608)
   pshankman@jhindslaw.com
3  HANNA B. RAANAN (SBN 261014)
   hraanan@jhindslaw.com
4  LAW OFFICES OF JAMES ANDREW HINDS, JR.
   21515 Hawthorne Blvd.
5  Suite 1150
   Torrance, California 90503
6  Telephone: (310) 316-0500
   Facsimile: (310) 792-5977
7
   Attorneys for Abdul Halim Sheikh, Chapter 11 Debtor and Debtor-in-Possession
8

9                    UNITED STATES BANKRUPTCY COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11                        LOS ANGELES DIVISION

12

13  In re                          )  CASE NO. 2:09-bk-39652-AA
                                    )
14                                  )  (Chapter 11)
    ABDUL HALIM SHEIKH,             )
15                                  )  **FOURTH AMENDED DISCLOSURE
                                    )  STATEMENT AND PLAN OF
16                                  )  REORGANIZATION FOR ABDUL
                                    )  HALIM SHEIKH**
17         Debtor and Debtor-in-Possession. )
                                    )  <u>Disclosure Statement Hearing</u>:
18                                  )
                                    )  DATE:    December 22, 2010
19                                  )  TIME:    11:00 a.m.
                                    )  PLACE:   Courtroom # 1375
20                                  )           255 E. Temple Street
                                    )           Los Angeles, CA
21                                  )
                                    )  <u>Plan Confirmation Hearing</u>:
22                                  )
    _____)  DATE:    [To Be Determined]
23

24      **TO THE HONORABLE ALAN M. AHART, UNITED STATES BANKRUPTCY**

25  **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE,  AND ALL CREDITORS**

26  **AND PARTIES-IN-INTEREST:**

27  / / /

28
                                    1.

**FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION**

**FOR ABDUL HALIM SHEIKH**

## I.    INTRODUCTION

On October 27, 2009, Abdul Halim Sheikh (hereinafter referred to as the "Debtor") filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code (hereinafter referred to as the "Code").  The document you are reading is both the Plan of Reorganization and the Disclosure Statement (hereinafter referred to as the "Plan").  The Debtor has proposed the Plan to treat the claims of the Debtor's creditors and, if applicable, the interests of shareholders or partners and to reorganize the Debtor's business affairs.  A disclosure statement describes the assumptions that underlie the Plan and how the Plan will be executed.  The Bankruptcy Court (hereinafter referred to as the "Court") has approved the form of this document as an adequate disclosure statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  The Court has not yet confirmed the Plan, which means the terms of the Plan are not now binding on anyone.

The Debtor has reserved February 2, 2011, at 10:00 a.m. in Courtroom # 1375 for a hearing to determine whether the Court will approve the Plan.

Any interested party desiring further information should contact: Rodaba S. Farid, Administrative Assistant at the Law Offices of James Andrew Hinds, Jr., 21515 Hawthorne Blvd., Suite 1150, Torrance, CA 90503, (310) 316-0500.

## II.    GENERAL DISCLAIMER AND VOTING PROCEDURE

PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS, CAREFULLY.  IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE PLAN.  IT EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  IT ALSO TELLS ALL CREDITORS AND ANY SHAREHOLDERS OR PARTNERS WHAT

TREATMENT THEY CAN EXPECT TO RECEIVE UNDER THE PLAN, SHOULD THE

PLAN BE CONFIRMED BY THE COURT.

THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS

DOCUMENT ARE SET FORTH IN THE DECLARATION IN SECTION XXI BELOW.  ALL

REPRESENTATIONS ARE TRUE TO THE DEBTOR'S BEST KNOWLEDGE,

INFORMATION, AND BELIEF.  NO REPRESENTATIONS CONCERNING THE

DEBTOR THAT ARE INCONSISTENT WITH ANYTHING CONTAINED HEREIN ARE

AUTHORIZED EXCEPT TO THE EXTENT, IF AT ALL, THAT THE COURT ORDERS

OTHERWISE.

After carefully reviewing this document and the attached exhibits, please vote on

the enclosed ballot and return it in the enclosed envelope.

The Debtor has reserved a hearing date for a hearing to determine whether the

Court will confirm the Plan.  Please refer to Section I above for the specific hearing date.

If, after receiving the ballots, it appears that the Debtor has the requisite number of votes

required by the Code, the Debtor will file a motion for an order confirming the Plan.

The Motion shall at least be served on all impaired creditors and partners or

shareholders who reject the Plan and on the Office of the United States Trustee.  Any

opposition to the Motion shall be filed and served on the Debtor no later than fourteen

days prior to the hearing date.  Failure to oppose the confirmation of the Plan may be

deemed consent to the Plan's confirmation.

III.    **WHO MAY OBJECT TO CONFIRMATION OF THE PLAN**

Any party in interest may object to confirmation of the Plan, but as explained below

not everyone is entitled to vote to accept or reject the Plan.

IV.    **WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN**

It requires both an allowed and impaired claim or interest in order to vote either to

3.

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

accept or reject the Plan.  A claim is defined by the Code to include a right to payment from the Debtor.  An interest represents an ownership stake in the Debtor.  In order to vote a creditor or interest-holder must first have an allowed claim or interest.  With the exceptions explained below, a claim is allowed if proof of the claim or interest is properly filed before any bar date and no party in interest has objected, or if the court has entered an order allowing the claim or interest.  Please refer to Section VI below for specific information regarding bar dates in this case.

Under certain circumstances a creditor may have an allowed claim even if a proof of claim was not filed and the bar date for filing a proof of claim has passed.  A claim is deemed allowed if the claim is listed on the Debtor's schedules and is not scheduled as disputed, contingent, or unliquidated.  Attached hereto as Exhibit "1", and incorporate herein as if set forth in full is a true and correct copy of a Schedule of Claims, Amounts Owed, and Amounts to be Paid, showing claims that are not scheduled as disputed, contingent, or unliquidated.

Similarly, an interest is deemed allowed if it is shown on the list of equity security holders filed by the Debtor with the court and is not scheduled as disputed.  In order to vote, an allowed claim or interest must also be impaired by the Plan.

Impaired creditors include those whose legal, equitable, and contractual rights are altered by the Plan, even if the alteration is beneficial to the creditor.  A contract provision that entitles a creditor to accelerated payment upon default does not, however, necessarily render the claimant impaired, even if the Debtor defaulted and the Plan does not provide the creditor with accelerated payment.  The creditor is deemed unimpaired so long as the Plan cures the default, reinstates the maturity of such claim as it existed before default, compensates for any damages incurred as a result of reasonable reliance upon the acceleration clause, and (except for a default arising from failure to operate a nonresidential lease subject to 11 U.S.C.A. § 365 (b)(1)(A) (West Supp. 2006))

/ / /

4.

1   compensates for any actual pecuniary loss incurred as a result of any failure to perform a

2   non-monetary obligation.

3        Impaired interest-holders include those whose legal, equitable, and contractual

4   rights are altered by the Plan, even if the alteration is beneficial to the interest holder.

5        There are also some types of claims that the Code requires be treated a certain

6   way.  For that reason they are considered unimpaired and therefore holders of these

7   claims cannot vote.

8        To summarize, there are two prerequisites to voting: a claim or interest must be

9   both allowed and impaired under the Plan.

10       If a creditor or interest-holder has an allowed and impaired claim or interest, then

11  he or she may vote either to accept or reject the Plan (unimpaired claimants or

12  interest-holders are deemed to have accepted the Plan).  Impaired claims or interests are

13  placed in classes and it is the class that must accept the Plan.  Members of unimpaired

14  classes do not vote, although as stated above, they may object to confirmation of the

15  Plan.  Even if all classes do not vote in favor of the Plan, the Plan may nonetheless be

16  confirmed if the dissenting classes are treated in a manner prescribed by the Code.

17  Please refer to Section VI below for information regarding impaired and unimpaired

18  classes in this case.

19       Section X sets forth which claims are in which class.  Secured claims are placed in

20  separate classes from unsecured claims.  Fed. R. Bankr. P. 3018(d) provides: "A creditor

21  whose claim has been allowed in part as a secured claim and in part as an unsecured

22  claim shall be entitled to accept or reject a plan in both capacities."

23

24  **V.    VOTES NECESSARY TO CONFIRM THE PLAN**

25       The Court may confirm the Plan if at least one non-insider impaired class of claims

26  has accepted and certain statutory requirements are met as to both non-consenting

27  members within a consenting class and as to dissenting classes.  A class of claims has

28

5.

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

1  accepted the Plan when more than one-half in number and at least two-thirds in amount

2  of the allowed claims actually voting, vote in favor of the Plan.  A class of interests has

3  accepted the Plan when at least two-thirds in the amount of the allowed interests of such

4  class actually voting have accepted it.  It is important to remember that even if the

5  requisite number of votes to confirm the Plan are obtained, the Plan will not bind the

6  parties unless and until the Court makes an independent determination that confirmation

7  is appropriate.  That is the subject of any upcoming confirmation hearing.

8

9  **VI.    INFORMATION REGARDING VOTING IN THIS CASE**

10          The bar date for filing a proof of claim in this case was January 29, 2010.

11          No bar date for objecting to claims has been set by the Court.

12          In this case the Debtor believes that Class 1, Class 2(A) and 2(B), Class 3(A),

13  Class 3(B), and Class 3(C), and Class 4 are all impaired and therefore entitled to vote.  A

14  party that disputes the Debtor's characterization of its claim or interest as unimpaired may

15  request a finding of impairment from the Court in order to obtain the right to vote.

16          Ballots must be received by the Debtor, addressed to Hanna B. Raanan, Esq., c/o

17  The Law Offices of James Andrew Hinds, Jr., 21515 Hawthorne Blvd., Suite 1150,

18  Torrance, CA 90503, by January 25, 2011.

19

20  **VII.   DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS**

21          **PRECIPITATING THE BANKRUPTCY FILING**

22          The Debtor is an individual.  The Debtor filed this chapter 11 case on October 27,

23  2009 (hereinafter referred to as the "Petition Date").  Since the Petition Date the Debtor

24  has operated his business as the Debtor-In-Possession under §§ 1107 and 1108 of the

25  Code.  The Debtor has conducted 80% of his business activity in Oceanside, California

26  since 2004.

27  / / /

28

6.

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

What follows is a brief summary of the dates and circumstances that led the Debtor to file bankruptcy:

1.    This emergency chapter 11 filing was ultimately necessitated by the actions of the Debtor's senior lender to have a receiver appointed as part of its pending state court action against the Debtor and the substantially completed commercial development located at 4253-4263 Oceanside Boulevard, Oceanside, California and commonly known as Oceanside Marketplace and Business Center (hereinafter referred to as the "Oceanside Project"). The current holder of the first Trust Deed, Oaktree Investments LLC (hereinafter referred to as "Oaktree"), is the assignee and successor-in-interest of East West Bank (hereinafter referred to as the "Bank"), the construction lender for the Oceanside Project.

2.    In order to construct the Oceanside Project, the Debtor retained Jaynes Corporation of California (hereinafter referred to as "Jaynes"). Jaynes was to complete construction pursuant to an agreed-to schedule. Jaynes completed substantial construction of the Oceanside Project 16-months late thus evoking the liquidated damages provision in the Jaynes Contract. The total maximum amount of the Debtor's liquidated damages claim is $760,000.00, plus interest, fees, and costs.

3.    The Bank ceased funding construction at the Oceanside Project prior to the last draw under the terms of the construction loan agreement causing a default with Jaynes, the general contractor.

4.    The Debtor contends that he and the Oceanside Project each hold claims against the Bank for fraud, lender liability, and breach of the terms of the construction loan agreement based upon written and oral representations made by an officer of the Bank to the Debtor and the Oceanside Project to provide both an extension on the construction loan and a mini-permanent loan for the Oceanside Project.

5.    The Debtor was unable to complete and lease out all of the units at the Oceanside Project in a timely fashion as a result of material construction problems and

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM SHEIKH

1  delays caused by Jaynes, the general contractor.  The actions of Jaynes caused the

2  Oceanside Project to be completed late and allowed the Bank to argue that it had the

3  option to cease funding the construction loan.  The failure of the Bank to fund the final

4  draws under the construction loan agreement resulted in the Debtor falling behind in his

5  payments to the general contractor and to the subcontractors which, in turn, resulted in

6  the recordation of multiple mechanics' liens against the Oceanside Project.

7      6.    Therefore, the emergency filing was mandated by the Debtor's desire

8  preserve asset value and the continuation of the going concern asset value of the

9  Oceanside Project.  The further prosecution of this case under chapter 11 was also

10  mandated by the desire to preserve assets value and deal fairly with all of the creditors of

11  the Estate.

12      7.    Pre-petition the Debtor was sued in the San Diego Superior Court by

13  Oaktree.  The Debtor answered the Oaktree Complaint, the Debtor filed a

14  Cross-Complaint, and removed the Oaktree Complaint to this Court.  (See <u>Oaktree</u>

15  <u>Investment Fund, LLC v. Sheikh</u>, Adv. No. 2:010-ap-01312 AA.)  In the Oaktree

16  Complaint matter the Debtor's Cross-Complaint is against Oaktree and its assignor, East

17  West Bank, seeking damages for **(i)** breach of contract, **(ii)** breach of the implied

18  cotenant of good faith and fair dealing, **(iii)** fraud, and **(iv)** declaratory relief.   By Order

19  entered by this Court in July 2010, the claims for relief for non-disclosure and declaratory

20  relief were dismissed with leave to amend.  An Amended Cross-Complaint has been filed

21  by the Debtor.  As part of the Oaktree-Stipulation (see Section IX. c below) the Debtor's

22  Cross-Complaint as to Oaktree only has been dismissed.

23      8.    Pre-petition the Debtor was sued in the San Diego Superior Court by

24  Jaynes.  The Debtor answered the Jaynes Complaint, the Debtor filed a

25  Cross-Complaint, and removed the Jaynes Complaint to this Court.  (See <u>Jaynes</u>

26  <u>Corporation of California v. Sheikh</u>, Adv. No. 2:10-ap-01311 AA.)  In this matter, the

27  Debtor filed a Cross-Complaint against Jaynes and Continental Casualty Company, the

28

8.

1  Surety Bond Company, seeking damages for: **(i)** breach of written contract; **(ii)**

2  declaratory relief; **(iii)** specific performance under bonds; and **(iv)** breach of covenant of

3  good faith and fair dealing.

4       9.     Pre-Petition, Oaktree held a senior lien against the Oceanside Project, a

5  junior lien against the Debtor's house, and a lien interest in the Debtor's family stock

6  portfolio.  Pursuant to the terms of the Oaktree-Stipulation Oaktree has released its claim

7  against the Debtor's house and released back to the Debtor the stock portfolio.

8       10.     Pre-Petition, Jaynes and various subcontractors of Jaynes held voidable

9  liens against the Oceanside Project.

10       What follows is a brief description of the Debtor's business and future business

11  plans.  Further details relating to the Debtor's financial condition and post-confirmation

12  operation of the Debtor are found in Sections X, XI, XII, XVI, and XV.

13       1.     The Debtor individually owns the Oceanside Project.

14       2.     The Debtor's wife owns a house located in Rancho Palos Verdes,

15  California.  The current fair market value of the Debtor's house is believed to be

16  approximately $2.9 million based on brokers' opinions of value obtained in the month of

17  August  2010.  The Debtor also has a stock portfolio, the current value of which is

18  approximately $100,000.00.

19       3.     The Debtor believes, based upon an appraisal dated July 6, 2010, that the

20  Oceanside Project is today worth between $10.0 (as-is value) and $12.0 million (as-

21  seasoned value).  The Appraisal is supported by the opinion of the brokers employed to

22  assist the Debtor in leasing the Oceanside Project and by the new leases obtained by the

23  Debtor post-petition and the stream of income to be generated from these new leases.

24       4.     The Debtor also receives a salary as an employee of FoodUSA, Inc., a food

25  supply and distribution company located in Redondo Beach, California.

26       5.     The Debtor's exit strategy in this case is and has been to: **(i)** complete the

27  leasing of the Oceanside Project and to allow rents to "season" so that the cash flow from

28

9.

1  the Oceanside Project is matured; **(ii)** aggressively prosecute his claims and causes of

2  action against both Jaynes and Oaktree/East West Bank; and **(iii)** to raise third party

3  money on a secured and unsecured basis to fund the continued leasing and

4  development of the Oceanside Project and to buy back the Note from Oaktree.   As part

5  of this effort the Debtor believes that his balance sheet can be restructured so the debts

6  securing the Oceanside Project better approximate the current fair market value of the

7  Oceanside Project.

8       6.     The Debtor express acknowledges and thus reserves all of the Estate's

9  litigation claims and rights as to East West Bank and Oaktree Investment Fund, LLC

10  arising out of the approval and funding of the priming financing obtained by the Debtor

11  from Lone Oak as part of the Oaktree-Stipulation for post-confirmation funding of the

12  Debtor (see Exhibit "2" hereto) and the bad faith conduct of East West Bank and Oaktree

13  Investment Fund, LLC in failing to disclose the secret, back-end lien interest granted to

14  East West Bank by Oaktree Investment Fund, LLC, which secret back-end lien delayed

15  the closing of the priming loan causing serious damage to the Estate.   The value of the

16  reserved contract and tort claims is presently unknown to the Debtor.

17

18  **VIII.**   **PRE-CONFIRMATION REQUIREMENTS OF DEBTOR**

19       The Debtor has filed all requested tax documents with the Court.   The Debtor has

20  no domestic support obligation that became payable post-petition.

21

22  **IX.**   **CRITICAL PLAN PROVISIONS**

23       Listed below are the sources of money earmarked to pay creditors and

24  interest-holders.

25       a.     All or such portion of earnings from personal services performed by the

26  Debtor after the commencement of this case or other future income of the Debtor as is

27  necessary for performance under the Plan.

28

1       b.     The Debtor will also use the net rents earned from the Oceanside Project to

2 make payments to creditors and interest holders.

3       c.     The Debtor has settled with his primary pre-petition secured creditor,

4 Oaktree, and has agreed to allow the Oaktree claim at $10,579,606.41, to agree to

5 payment terms on the allowed claim and debt, in exchange for which Oaktree has agreed

6 to extend the Oaktree Note through December 31, 2012, to release Oaktree's lien against

7 the Debtor's house and the Debtor's stock portfolio, and to allow the Debtor to receive a

8 priming loan of up to $600,000 secured by a new first trust deed against the Oceanside

9 project.  A true and correct copy of the Order approving the Oaktree-Stipulation is

10 attached hereto as Exhibit "2."  In all respects the terms of the Debtor's Plan and this

11 Disclosure Statement are intended to confirm to the terms of the Oaktree-Stipulation and

12 the related Order.   (See Docket Item ## 148 and 151.)

13       d.     The Debtor has settled with its construction lender Jaynes, and has agreed

14 to an allowed mechanic lien claim for Jaynes of $750,000.00, to allow the remand of the

15 pending adversary proceeding between Jaynes and the Debtor to the San Diego County

16 Superior Court, dismissal of the Debtor's filed Cross-Complaint as to Jaynes only,

17 provision for Jaynes to pay itself and its subcontractors from the consummation of the

18 Stop Notice litigation against East West Bank in the state court proceeding,

19 indemnification of the Debtor for any claim of subcontractors asserted against the Debtor

20 and/or the Oceanside project, release of claims between the parties, and the reservation

21 of claims held by both Jaynes and the Debtor against East West Bank.  The hearing on

22 the approval of the Jaynes Settlement is set for December 15, 2010.

23      Most likely, general unsecured creditors can expect a zero payment under the

24 Plan unless there is a substantial recovery from East West Bank on the pending

25 adversary proceeding.  The Debtor cautions all unsecured creditors that this is not likely

26 and that the Plan is not premised upon there being a substantial net recovery sufficient to

27 / / /

28

11.

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

pay off Lone Oak, Oaktree, and fund post-confirmation operations of the Oceanside Project.

The claims held by Oaktree will be dealt with in conformance with the terms of the Oaktree-Stipulation between the Debtor and Oaktree as approved by the October 1, 2010-Order.

Most likely the claims of East West Bank will be objected to and offset by the litigation claims asserted by the Debtor as part of the Oaktree adversary proceeding. No payment is expected for the Bank under the Debtor's Plan other than as set forth in the Oaktree-Stipulation. While there is no guaranty, the Debtor expects to recover at least $2.8 million from East West Bank on its Cross-Complaint. The Debtor has investigated the facts and the law underlying its claims against the Bank and thus believes that he has good and valid claims against the Bank. The record shows that East West Bank in writing promised the Debtor mini-permanent financing or an extension of the existing loan if the Debtor posted additional collateral to the Bank. The Debtor, in reliance upon the written representations of the Bak, posted a second lien on his house and provided the Bank with a pledge on his stock account. The Bank then failed to provide the Debtor with either mini-permanent financing or an extension of the existing loan. The Debtor has sued East West Bank for, among other things, fraud, breach of contract, and lender liability.

The Debtor further believes that the Bonded Stop Notice Claims held by Jaynes and its subcontractors have significant value. The Debtor intends to fully cooperate with Jaynes and its subcontractors in the continued litigation against the Bank in the San Diego Superior Court. 70% of the net recovery from the East West Bank litigation is committed to Oaktree and a principal reduction under the terms of the Stipulating and October 1, 2010-Order.

For purposes of the Debtor's pro forma attached to this Disclosure Statement the Debtor believes that the cost of participating in the Jaynes Bonded Stop Notice litigation

12.

before the San Diego Superior Court will be insignificant to the Estate since all of the attorneys' fees and costs will be borne by Jaynes.  The Debtor further projects that the adversary proceeding with East West Bank will be stayed until completion of the Jaynes Bonded Stop Notice litigation before the San Diego Superior Court since there is the potential for inconsistent results between the two cases.

Consistent with the terms of the Oaktree-Stipulation, the Debtor is prepared to provide counsel with a junior lien against his house in order to finance the prosecution of the claims against East West Bank.  At this time the Debtor anticipates the costs of prosecuting claims against East West Bank to be between $75,000.00 to $150,000.00. The potential sources for the funding of the fees and coss of the East West Bank action are: **(1)** from the Debtor's food business assuming that the Debtor takes on a partner and/or **(2)** the negotiation of a buy out the Lone Oak and Oaktree debt.

The claims held by Oaktree will be dealt with in conformance with the terms of the Oaktree-Stipulation between the Debtor and Jaynes.

Under the terms of the proposed settlement between Jaynes and the Debtor all of the claims of the Jaynes' subcontractors will be resolved by the final settlement between Jaynes and the Debtor and the mechanics' lien claims will be paid by Jaynes and/or the Bank under the terms of the Bonded Stop Notices filed by or for Jaynes and its subcontractors.

The Debtor has on file his Omnibus Objections to Claim held by each of the following creditors: **(1)** Amir Dargahi Nobari; **(2)** Robertson's Ready Mix; **(3)** Imperial Sprinkler Supply; **(4)** Lyons Masonry, Inc.; **(5)** Thunder Jones Contracting; **(6)** Jaynes Corporation; **(7)** A&M Reinforcing Specialists; **(8)** Daniel Schaldach, Inc. dba D&S Construction Co.; and **(9)** Kha B. Thai and Loan Nguyen.  Many of these objected-to claims are subcontractors of Jaynes and under the terms of the Jaynes Settlement will be paid by Jaynes once the Jaynes Settlement has been approved by this Court.  The other claim objections will proceed to hearing.

13.

1  The Debtor has been the subject of various post-petition claims which the Debtor

2  views and ordinary course of business matters.  None is deemed at this time to be

3  material to the consummation of the Plan.

4  Most likely the claims of the class of unsecured creditors will receive no distribution

5  under the Plan.

6

7  **X.  DESCRIPTION AND TREATMENT OF CLAIMS**

8  **a.  Overview of Plan Payments**

9  Exhibit "1" shows a summary of who gets paid what and when and from what

10  source(s).  The identity of members within a particular class is explained beginning on the

11  next page.  The second column and third column list two amounts.  First, the amount of

12  each payment, or if only one is to be made, then that amount; second, the total amount

13  that will be paid.  The Debtor is usually not required by law to pay an unsecured creditor

14  or interest holder everything it would otherwise be entitled to, had a bankruptcy case not

15  commenced.  The "Payment Due Date" column states the frequency with which

16  payments will be made and the starting and ending dates.  Look at the starting date to

17  figure out who will be paid before and after you and in what amount.  The "Source of

18  Payment" column describes the expected source of payment.  Further details regarding

19  the source of payment are found in Sections XI and XII.

20  The timing of payments to many creditors is determined by the "Effective Date."

21  Administrative claims, unless otherwise stated, must be paid in full by the Effective Date.

22  The timing of payments to impaired creditors is measured from the Effective Date.  In this

23  case, the Effective Date is January 4, 2011, or an earlier (or later) date as set by the

24  Court.

25  Payments under the Plan will be made from the cash flow of the Oceanside project

26  for all creditors whose claims arise from or relate to the Oceanside project. 100% of the

27  net cash flow is presently committed to Oaktree under the terms of the Oaktree-

28

14.

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

Stipulation and the October 1, 2010-Order (as supplemented by other Orders of the Court).  After payments made to Oaktree under the terms of the Oaktree-Stipulation and the October 1, 2010-Order, 100% of the excess will be paid to the Debtor.

Creditors holding claims which do not arise from or relate to the Oceanside project will be paid from the cash flow of the Debtor's food business or other non-debtor sources.

The disputed claims are the following:

a.    Kha B. Thai and Loan Nguyen – objection filed by November 15, 2010

b.    Amir Dargahi Nobari – objection filed by November 15, 2010

c.    East West Bank – subject to the pending Cross-Complaint on file

d.    Superior Electrical – objection filed by November 15, 2010

Below is a detailed description and treatment of administrative expenses, claims and interests.

**b.    Administrative Expenses**

1.    These include the "actual, necessary costs and expenses of preserving the estate" as determined by the Court after notice to creditors of a request for payment and after a hearing thereon.

2.    The Code requires that allowed administrative expenses be paid on the effective date unless the party holding the administrative expense agrees otherwise.  The administrative claimants discussed below have each agreed to payment terms on their allowed administrative expense claims.

Administrative Expense # 1.

Claimant:  Law Offices of James Andrew Hinds, Jr.

Estimated to be $400,000.00, subject to court approval.  Payment will be made from the liquidation of the released stock portfolio and other post-confirmation sources, including by agreement with Oaktree under the terms of the Oaktree-Stipulation, the operations of

/ / /

15.

the Debtor's food business, and a post-confirmation buy out of the Lone Oak and

Oaktree claims.

Administrative Expense # 2.

Claimant:  The Accountancy Firm of Dennis M. Murphy, CPA, CIRA

Estimated to be $60,000.00, subject to court approval.  Payment will be made from the

liquidation of the released stock portfolio and other post-confirmation sources, including

by agreement with Oaktree under the terms of the Oaktree-Stipulation, the operations of

the Debtor's food business, and a post-confirmation buy out of the Lone Oak and

Oaktree claims.

Administrative Expense # 3.

Claimant:  Colliers International

Estimated to be $132,000.00, subject to court approval and payment as leases are

funded.  Payment will be made from agreement with Oaktree under the terms of the

Oaktree-Stipulation, post-petition rents from the units, and the post-confirmation buy out

of the Lone Oak and Oaktree claims.

Administrative Expense # 4.

Claimant:     Afbal Nawaz

Estimated to be $130,000.00, per Court Order entered on February 25, 2010, Court

allowed Debtor to borrow $130,000.00 from Mr. Nawaz under the following conditions:

24-month interest-free term, with no payments until end of term.  At the end of

24-months, the loan will due and payable in full.  If the Debtor is unable to repay the

entire sum of $130,000.00 at the end of 24-months, Mr. Nawaz shall receive a 10%

ownership interest in the Oceanside Project as part of any plan confirmed by Order of the

Court. The Nawaz Order predates the entry of the Oaktree Stipulation and thus, the

16.

1   Oaktree Stipulation is arguably subject to the Nawaz Order.  As to the Nawaz claim the

2   Debtor has renegotiated with Mr. Nawaz an extension of the due date on his claim so that

3   payment of the claim will be after the end of the term of the Oaktree-Stipulation (see

4   Exhibit "2" hereto).  In addition the Debtor has scheduled post-plan confirmation payment

5   for the Nawaz claim from available post-confirmation funding to pay, in part, the Nawaz

6   claim.

7

8   Administrative Expense # 5.

9   Claimant:  Kimball, Tirey & St. John, LLP

10  Estimated to be $1,384.00, subject to court approval.  Payment will be made from the

11  liquidation of the released stock portfolio and other post-confirmation sources, including

12  by agreement with Oaktree under the terms of the Oaktree Stipulation.

13

14  Administrative Expense # 6.

15  Claimant:  Robert M. Harding

16  Estimated to be $19,753.00, subject to court approval.  Payment will be made from the

17  liquidation of the released stock portfolio and other post-confirmation sources, including

18  by agreement with Oaktree under the terms of the Oaktree-Stipulation, the operations of

19  the Debtor's food business, and a post-confirmation buy out of the Lone Oak and

20  Oaktree claims.

21

22  Administrative Expense # 7.

23  Claimant: Promus Property Management dba Promus Commercial

24  Estimated to be $2,114.50, subject to court approval.  Payment will be made from the

25  priming loan and from post-confirmation sources, including by agreement with Oaktree

26  under the terms of the Oaktree Stipulation.

27  / / /

28

17.

1   TOTAL $745,251.50 (estimated)

2

3       As part of the Plan the Debtor expects each of these administrative creditors to

4   waive all or a part of their right to payment in full as of the Effective Date to agree to

5   payment over time post plan confirmation.  The terms of these agreements will be part of

6   the Orders allowing final compensation in the case.

7

8       **c.    Unsecured Tax Claims**

9       1.      These include certain types of property, sales, and income taxes.

10      2.      The Code requires that the holders of such claims receive regular

11  installment payments in cash over a period ending not later than five -years after the date

12  of the order for relief, unless agreed otherwise.  The claimant has not agreed otherwise.

13  The total cash payments must have a present value equal to the amount of the Allowed

14  Claim.  The treatment of this claim is in a manner not less favorable than the most

15  favored nonpriority unsecured claim provided in this Plan. The amount of the allowed

16  claim includes the amount of tax owed plus interest of 1.5%.  The present value is

17  calculated as of the effective date.

18

19  Tax Claim

20  Claimant:  Los Angeles County Treasurer and Tax Collector

21  Date(s) of order for relief: October 27, 2009

22  Total amount of allowed claim as of February 4, 2011:  $5,655.84

23  Total amount of cash payments (over time) to satisfy the claim: 1

24  Interest  rate (to compensate creditor because claim is paid over time): N/A

25  First payment date: February 4, 2011 or the Effective Date, whichever os later

26  Amount of each installment: One-time installment of $5,655.84

27  Frequency of payments: One-time full payment of claim

28

18.

1  Total yearly payments: 1

2  Final Payments date: February 4, 2011 or the Effective Date, whichever os later

3

4  **TOTAL UNSECURED TAX CLAIM(S):** $ 5,655.84

5

6  **d.    CLASS ONE**

7         Unless the election is not available, each class of secured claim(s) may elect 11

8  U.S.C. §1111(b)(2) treatment at any time prior to the conclusion of the hearing on the

9  disclosure statement or within such time as the Court may fix.

10

11  CLASS 1

12  Secured Claim of East West Bank/ Oaktree Equities, Inc.; Oaktree Investment Fund, LLC

13  Total amount of allowed claim: $10,579,606.41.

14  Total amount of payments (over time) to satisfy the secured claim: 27

15  Interest rate  (Pursuant to the Oaktree-Stipulation and the October 1, 2010-Order).

16  Impaired

17  First payment date:  Pursuant to the Oaktree-Stipulation and the October 1, 2010-Order.

18  Amount of each installment: Pursuant to the Oaktree-Stipulation and the October 1,

19  2010-Order

20  Frequency of payments:  Monthly

21  Total yearly payments: 27

22  Final payment date: December 31, 2012 – balloon payment due pursuant to the Oaktree-

23  Stipulation and the October 1, 2010-Order

24  Description of Collateral:  Oceanside Marketplace and Business Center located at

25  4253-4263 Oceanside Boulevard, Oceanside, California 92563 (according to the Debtor's

26  appraisal - $12 million).

27  / / /

28

19.

Additional comments: the terms of the Oaktree-Stipulation and the October 1, 2010-

Order are set forth in Exhibit "2" hereto.

e.    **CLASS TWO**

CLASS 2(A)

Secured Claim of Chase (WAMU).

Total amount of allowed claim: $2,505,000.00 (First and Second Mortgages against the

Debtor's house)

Total amount of payments (over time) to satisfy the secured claim: per the agreement

Interest rate (to compensate creditor because claim is paid over time):  Current

mortgage interest rate, or as modified between the parties.

Unimpaired

First payment date: Debtor will continue with current payments to Chase

Amount of each installment: $8,839.00

Frequency of payments:  Monthly

Total yearly payments:  12

Final payment date: December 1, 2015

Lien is not modified in any way by the Plan.

Description of Collateral: 2733 Via Miguel, Palos Verdes Estates, CA 90274

Additional comments: The Debtor as applied for a loan modification with Chase and

expects to lower the interest rate and the monthly payments for a period of at least 27-

months or through December 31, 2012.  The loan modification is in process.


Class 2 (B)

Secured Claim of Western Federal Credit Union

Total amount of allowed claim: $10,000.00

Total amount of payments (over time) to satisfy the secured claim: 60

Interest rate (to compensate creditor because claim is paid over time): Current interest rate

Unimpaired

First Payment Date: December 15, 2010

Amount of each installment: $315.98

Frequency of payments: monthly

Total yearly payments: 12

Final payment date: January 15, 2015

The lien is not modified in any way by the Plan

Description of collateral: 2006 Toyota Highlander

### f.    CLASS THREE

Claim 3(A)

Mechanics' Lien Claims of any and subcontractors of Jaynes on the Oceanside Project

Total amount of allowed claim: $1,271,926 (estimated) – see Exhibit 3(A) attached hereto for a list of the members of Class 3(A).

Total amount of payments (over time) to satisfy the secured claim: None

Interest rate (to compensate creditor because claim is paid over time): None

Impaired

First payment date: N/A

Amount of each installment: N/A

Frequency of payments: N/A

Total yearly payments: None

Final payment date: N/a

Liens, if any, held by the subcontractors of Jaynes are to be paid by Jaynes as part of the prosecution of the state court claims held by Jaynes against East West Bank in Case No. 2009-0477222, San Diego Superior Court as provided for under the terms of the

21.

1  proposed settlement between Jaynes and the Debtor.

2  Description of Collateral:  Oceanside Marketplace and Business Center located at

3  4253-4263 Oceanside Boulevard, Oceanside, California 92563

4  Additional comments:

5

6  CLASS 3(B)

7  Mechanics' Lien Claims of any and subcontractors other than those related or arising

8  from the work performed by or for Jaynes on the Oceanside Project.

9  Total amount of allowed claim: $74,665.60 (estimated) – see Exhibit 3(B) attached hereto

10  for a list of the members of Class 3(B).

11  Total amount of allowed claim: Unknown – subject to claim objections (Mechanic's Lien)

12  Total amount of payments (over time) to satisfy the secured claim: 1

13  Interest rate (to compensate creditor because claim is paid over time):  the federal

14  judgment interest rate in effect as of the date of Plan Confirmation or the date the claim is

15  no longer disputed under the Plan.

16  Impaired

17  First payment date: the date the claim is no longer disputed under the Plan with payment

18  to be made on the date that the senior lien claims are paid through sale or refinance of

19  the Oceanside Project.  The estimated date is December 31, 2012.

20  Amount of each installment: N/A

21  Frequency of payments: On the date that the senior lien claims are paid through sale or

22  refinance of the Oceanside Project.  The estimated date is December 31, 2012.

23  Total yearly payments: N/A

24  Final payment date: On the date that the senior lien claims are paid through sale or

25  refinance of the Oceanside Project.  The estimated date is December 31, 2012.

26  Lien is not modified in any way by the Plan.

27  Description of Collateral:  Oceanside Marketplace and Business Center located at

28

22.

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

1  4253-4263 Oceanside Boulevard, Oceanside, California 92563.

2  Additional comments:

3

4  CLASS 3(C)

5  Mechanics' Claim of Jaynes Corporation of California

6  Total amount of allowed claim: $750,000.00 (Mechanics Lien)

7  Total amount of payments (over time) to satisfy the secured claim: None

8  Interest rate (to compensate creditor because claim is paid over time): N/A

9  Impaired

10  First payment date: the lien, if any, held by Jaynes and the subcontractors of Jaynes are

11  to be paid by Jaynes as part of the prosecution of the state court claims held by Jaynes

12  against East West Bank in Case No. 2009-0477222, San Diego Superior Court as

13  provided for under the terms of the proposed settlement between Jaynes and the Debtor.

14  Amount of each installment: N/A

15  Frequency of payments: N/A

16  Total yearly payments: unknown

17  Final payment date: unknown

18  Lien is not modified in any way by the Plan.  Jaynes will prosecute its Lien and Stop

19  Notice claims against East West Bank on the Oceanside Project; however, no judicial

20  foreclosure by Jaynes of the Lien will occur without Jaynes obtaining approval from this

21  Court, as applicable.  The stated goal of Jaynes and the Debtor is that Jaynes and all of

22  tis subs will be paid from East West Bank and said payment will extinguish Jaynes' claim

23  and the Lien against the Debtor.

24  Description of Collateral:  Oceanside Marketplace and Business Center located at

25  4253-4263 Oceanside Boulevard, Oceanside, California 92563

26  Additional comments: Jaynes will prosecute its Lien and Stop Notice claims against East

27  West Bank on the Oceanside Project; however, no judicial foreclosure by Jaynes of the

28

23.

Lien will occur without Jaynes obtaining approval from this Court, as applicable.  The stated goal of Jaynes and the Debtor is that Jaynes and all of tis subs will be paid from East West Bank and said payment will extinguish Jaynes' claim and the Lien against the Debtor.

**g.    CLASS FOUR**

Unsecured Claims

      See Exhibit "4" for list of claimants and amount owed each.

Total amount of allowed claims: $225,011.75.

Total amount of payments (over time) to satisfy claims: None

Interest rate: N/A

Impaired

First payment date: N/A

Amount of each installment: None

Frequency of payments: None

Total yearly payments: None

Final payment date: N/A

Additional comments


**h.    CLASS FIVE**

Insider Claims

      1.    This is the claim of a person as defined in 11 U.S.C.A. § 101(31) (West Supp. 2006).  Essentially, an insider is a person with a close relationship with the debtor, other than a creditor-debtor relationship.

Insider # 1.  Abdul Halim Sheikh.

Claimant:  Abdul Halim Sheikh.

Total amount of allowed claim: Up to $500,000.00 advanced by the Debtor during the

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM SHEIKH

past 4-years for the development of the Oceanside Project.

Total amount of payments (over time) to satisfy claims:

Interest rate (to compensate creditors because claim is paid over time): None

Impaired

First payment date: None.

Amount of each installment: The Insider will waive his claims.

Frequency of payments: N/A

Total yearly payments: N/A

Final payment date: N/A

Additional comments:

**TOTAL INSIDER CLAIMS** $ 0.00

i.      **CLASS SIX**

Shareholders Interests

1.      There are no shareholders in this case.  The Debtor is an individual who will retain his ownership interest n all of the Estate's assets through confirmation of the Plan. It is proposed that as part of the Plan the Debtor contribute up to $2000,000.00 of new value to the operations of the Oceanside Project in exchange to retention of his 100% ownership right.

**XI.      SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS**

The Plan cannot be confirmed unless the Court finds that it is "feasible," which means that the Debtor has timely submitted evidence establishing that the Debtor will have sufficient funds available to satisfy all expenses, including the scheduled creditor payments discussed above.  What follows is a statement of projected cash flow for the duration of the Plan.  The focus is on projected cash receipts and cash disbursements.

25.

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM SHEIKH

1 | All non-cash items such as depreciation, amortization, gains and losses are omitted. A
2 | positive number reflects a source of cash; a (negative number) reflects a use of cash. A
3 | more detailed statement of cash flow projections for the duration of Plan payments is
4 | attached hereto as Exhibit "5" and incorporated herein as if set forth in full.

5 | Section XV(c) states the assumptions and details surrounding the statement of
6 | projected cash flow.

7 | On the Effective Date, the Plan proposes to pay all of the Estate's administrative
8 | claims on a deferred basis over a period of one-year as and when final fees are approved
9 | by this Court and the payments to be made to Oaktree will be in accordance with the
10 | Oaktree-Stipulation and the October 1, 2010-Order. As part of the Oaktree-Stipulation
11 | and the October 1, 2010-Order and the Lone Oak priming loan Oaktree has approved
12 | certain payments to, among others, the professionals against the interim approved fees
13 | and costs, Colliers, for commissions already earned, and Promus, for management of the
14 | Oceanside Project. The source of payment of post-confirmation fees and costs is
15 | expected to be **(1)** from the Debtor's food business assuming that the Debtor takes on a
16 | partner, **(2)** payments from the final recovery from East West Bank in the pending
17 | adversary proceeding, **(3)** the negotiation of a buy out the Lone Oak and Oaktree debt,
18 | and /or **(4)** other agreements entered into between the Debtor and Oaktree. The claim of
19 | the Los Angeles County Treasurer and Tax Collector in the total sum of $5,655.84, will be
20 | paid in full on the Effective Date.

21 | **Through their respective filings with the Court, the Debtor and Oaktree have**
22 | **stated positions on the status of the Oaktree-Stipulation. The Debtor and Oaktree**
23 | **each assert (or may assert) that the other party to the Oaktree-Stipulation may be in**
24 | **breach or that the confirmation and consummation of the Debtor's Plan may result**
25 | **in a breach of the Oaktree-Stipulation. The Debtor and Oaktree each reserve and**
26 | **do not waive and will not assert estoppel rights resulting from the approval of the**
27 | **Disclosure Statement and/or the confirmation and consummation of the Debtor's**
28 |

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

1 **Plan.  Approval of the Disclosure Statement and/or confirmation and**

2 **consummation of the Debtor's Plan shall not be deemed by either party to be a**

3 **modification of the terms of the Oaktree-Stipulation.**

4

5 **XII.    FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER PROPOSED**

6 **PAYMENT IS FEASIBLE**

7 Attached hereto as Exhibits "5", "6" and "7", and incorporated herein as if set forth

8 in full, are true and correct copies of three types of financial documents, including cash

9 flow statements, balance sheets, and income and expense statements for the period

10 including the most recent twelve-month calendar year and all months subsequent thereto.

11

12 **XIII.    ASSETS AND LIABILITIES OF THE ESTATE**

13 **a.    Assets**

14 The identity and fair market value of the Estate's assets are listed in Exhibit "8", a

15 true and correct copy of which is attached hereto and incorporated herein as if set forth in

16 full, so that the reader can assess what assets are at least theoretically available to

17 satisfy claims and to evaluate the overall worth of the bankruptcy Estate.  Whether the

18 Plan proposes to sell any of these assets is discussed in Section XVII.

19

20 **b.    Liabilities**

21 Exhibit "1" shows the allowed claims against the estate, claims whose treatment is

22 explained in detail by Section IX.

23

24 **c.    Summary**

25 The fair market value of all Estate assets is believed to be $15,217,868.02.  This

26 fair market value of the Estate's assets is based in substantial part of the Debtor's ability

27 to rent our100% of the available space at the Oceanside Project and then to "season" the

28

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

1  Oceanside Project and thus generate rents of each of the tenants.  Total liabilities are

2  believed to be $14,805,274.16 (including disputed mechanics' liens claims and claims

3  which are derived from the Jaynes construction at the Oceanside Project).  A number of

4  listed liabilities are deemed contested and unliquidated.  The claims held by Oaktree

5  have been modified to be consistent with the Oaktree-Stipulation and the October 1,

6  2010-Order. Several are subject to offset as part of the Estate's claims preserved as part

7  of <u>Jaynes Corporation of California v. Sheikh</u>, Adv. No. 2:10-ap-01311 AA and <u>Oaktree</u>

8  <u>Investment Fund, LLC v. Sheikh</u>, Adv. No. 2:010-ap-01312 AA.

9

10  **XIV.    TREATMENT OF NON-CONSENTING CLASSES**

11          As stated above, even if all classes do not consent to the proposed treatment of

12  their claims under the Plan, the Plan may nonetheless be confirmed if the dissenting

13  classes are treated in a manner prescribed by the Code.  The process by which

14  dissenting classes are forced to abide by the terms of a plan is commonly referred to as

15  "cramdown."  The Code allows dissenting classes to be crammed down if the Plan does

16  not "discriminate unfairly" and is "fair and equitable."  The Code does not define

17  discrimination, but it does provide a minimum definition of "fair and equitable."  The term

18  can mean that secured claimants retain their liens and receive cash payments whose

19  present value equals the value of their security interest.  For example, if a creditor lends

20  the Debtor $100,000 and obtains a security interest in property that is worth only

21  $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash

22  payments whose present value equals $80,000 and not $100,000.  The term means that

23  unsecured claimants whose claims are not fully satisfied at least know that no claim or

24  interest that is junior to theirs will receive anything under the Plan, except where the

25  Debtor is an individual, has elected to retain property included in the Estate under 11

26  U.S.C.A. § 1115 (West Supp. 2006) and has satisfied 11 U.S.C.A. § 1129(b)(2)(B)(ii)

27  / / /

28

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

1  (West Supp. 2006).  "Fair and equitable" means that each holder of an interest must

2  receive the value of such interest or else no junior interest is entitled to receive anything.

3      Therefore, if a class of general unsecured claims votes against the Plan, the Plan

4  cannot be confirmed where the Debtor or a class of interest holders (e.g., shareholders or

5  partners) will receive or retain any property under the Plan, unless the Plan provides that

6  the class of general unsecured claims shall be paid in full with interest.  Notwithstanding

7  the foregoing, because the Debtor is an individual, the Debtor may retain property of the

8  estate, so long as the Debtor has paid all amount that came due on a domestic support

9  obligation post-petition.  The Debtor has decided to retain the following:

10     1.  Oceanside Marketplace and Business Project, located at 4253-4263 Oceanside

11  Boulevard, Oceanside, California 92563

12     2.  Residential Home, 2733 Via Miguel, Palos Verdes Estates, California 90274

13     3.  Cash on hand

14     4.  Checking/Savings accounts

15     5.  Security Deposits

16     6.  Household goods

17     7.  Books, art, etc.

18     8.  Clothing

19     9.  Furs, Jewelry, etc.

20     10.  Life Insurance

21     11.  Stock Portfolio

22     12.  Ownership interest in FoodUSA

23     13.  Oceanside Bonds - Improvement Bonds

24     14.  Claims against East West Bank

25     15.  Vehicles

26     16.  Office Equipment

27  / / /

28

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

1       These are complex statutory provisions and the preceding paragraphs do not

2  purport to state or explain all of them.

3

4  **XV.    TREATMENT OF NON-CONSENTING MEMBERS OF CONSENTING CLASS**

5  **(CHAPTER 7 LIQUIDATION ANALYSIS)**

6       The Plan must provide that a non-consenting impaired claimant or interest holder

7  of a consenting class receive at least as much as would be available had the Debtor filed

8  a Chapter 7 petition instead.

9       In a Chapter 7 case the general rule is that the Debtor's assets are sold by a

10  trustee.  Unsecured creditors generally share in the proceeds of sale only after secured

11  creditors and administrative claimants are paid.  Certain unsecured creditors get paid

12  before other unsecured creditors do.  Unsecured creditors with the same priority share in

13  proportion to the amount of their allowed claim in relationship to the total amount of

14  allowed claims.

15       A creditor would recover from the assets of the bankruptcy estate less under

16  Chapter 7 than under Chapter 11 for three reasons.   First, the liquidation value of the

17  Debtor's assets is less than its fair market value because the liens on the Debtor's largest

18  assets, the Oceanside Project and his residence, are greater than their current value.  As

19  a result, no unsecured creditors would be paid after the liquidation of the Debtor's non-

20  exempted assets.   Reorganization is the only way that unsecured creditors will recover

21  any amount using the income from rent at the Oceanside Project.  Second, in a chapter 7

22  case a trustee is appointed and is entitled to compensation from the bankruptcy estate in

23  an amount no more than 25% of the first $5,000 of all moneys disbursed, 10% on any

24  amounts over $5,000 and up to $50,000, 5% on all amounts over $50,000 and up to

25  $1,000,000, and such reasonable compensation no more than 3% of moneys over

26  $1,000,000.  Finally, a chapter 7 recovery may be less because an individual debtor is

27  permitted to exempt a certain amount of the sales proceeds before unsecured creditors

28

are paid anything.  Attached hereto as Exhibit "9" and incorporated herein as if set forth in full is a true and correct copy of the Liquidation Analysis.

**XVI.    FUTURE DEBTOR**

**a.    Management of Debtor**

      1.    Names of persons who will manage the Debtor's business affairs: Abdul Halim Sheikh.

      2.    Proposed compensation to persons listed above: None during the first two years of the Plan.  Once the Oceanside Project is fully leased Mr. Sheikh will be paid a percentage of the net income from the collected rents.  These payments will be disclosed to all parties-in-interest as part of the post plan confirmation reports filed by the Debtor.

      3.    Qualifications: As the developer of the Oceanside Project and the manager of the food business, Mr. Sheikh is the best suited and positioned to manage his own affairs.

      4.    Affiliation of persons to Debtor: Mr. Sheikh is the Debtor

      5.    Job description: Owner and manager of Oceanside Marketplace and Business Center; employee and 100% shareholder of FoodUSA.

**b.    Disbursing Agent**

      Abdul Halim Sheikh is responsible for collecting money intended for distribution to claimants and transmitting it to them.  The disbursing agent's address and telephone number are: 2733 Via Miguel, Palos Verdes Estates, California 90274; (310) 402-3663.

      1.    <u>Proposed compensation to person listed above</u>: None during the first two years of the Plan.  Once the Oceanside Project is fully leased Mr. Sheikh will be paid a percentage of the net income from the collected rents.  These payments will be disclosed to all parties-in-interest as part of the post plan confirmation reports filed by the Debtor.

/ / /

2.    <u>Qualifications</u>: Mr. Sheikh is the developer of the Oceanside Project and is therefore in the best position to manage his affairs and the distribution and payments under his Plan.

3.    <u>Affiliation of person to Debtor</u>: Mr. Sheikh is the Debtor.

4.    <u>Job description</u>:  Owner and manager of Oceanside Marketplace and Business Center; employee and 100% shareholder of FoodUSA.

**c.    Future Financial Outlook**

The Debtor believes that his economic health will improve from his pre-bankruptcy state for the following reasons.  The time provided for in the Plan, by allowing the Debtor to make payments on his debt over time, rather than immediately, and money provided through the approved financing, will allow the Debtor the time and resources needed to complete the TI's at the Oceanside Project, allow the rents to "season" and begin collecting the full benefit of the rents at the Oceanside Project, and will allow the Debtor to prosecute his claims against East West Bank.  The agreement with Oaktree as reflected in the Oaktree-Stipulation and the October 1, 2010-Order allows the Debtor two-years of mini-permanent financing in a marketplace were new money is hard to nail down.  The Oaktree agreement removed as collateral the Debtor's personal residence and stock portfolio, all of which will <u>increase</u> the value of the Debtor's assets, <u>decrease</u> his liabilities, and leave him able to proceed focused solely on the future of the Oceanside Project.

Section XI provides a summary of the projected cash flow of the Debtor for the duration of the Plan.  The following assumptions underlie the projections:

1.    The numbers for January through November-2010 are actual, the rest are assumed;

/ / /

/ / /

32.

2.     The Debtor is able within 120-days to lease the balance of the tenant space at the Oceanside Project and to keep the project 100% leased through December 31, 2012 when the Oaktree loan is due;

3.     The Debtor is able finance all TIs and brokers' commissions from the cash flow of the Oceanside Project, the borrowing from Lone Oak, further agreements with Oaktree, and the deposits made by new tenants;

4.     Jaynes is successful in its suit against East West Bank, and as a result collects 100% of the Bonded Stop Notice Claims against East West Bank and then pays off all of the Mechanics' lien claims (Jaynes and its subcontractors' claims) thus releasing all subcontractor Mechanics' lien claims against the Oceanside Project;

5.     The Debtor is successful in his prosecution of fraud and lender liability claims against East West Bank and recovers up to $2.8 million from East West Bank;

6.     All allowed administrative fees will be paid in full over one-year from the date that the final fees and costs are approved by this Court from **(1)** the Debtor's food business assuming that the Debtor takes on a partner, **(2)** payments from the final recovery from East West Bank in the pending adversary proceeding, **(3)** the negotiation of a buy out the Lone Oak and Oaktree debt, and /or **(4)** other agreements entered into between the Debtor and Oaktree;

7.     LA County Tax claim for 2010 was paid through the close of escrow in the Lone Oak priming financing;

8.     The Debtor takes on a partner in his food business for $250,000 in 2011;

9.     The new revenue from the Debtor's food business increase in 2011 and 2012 by 20% per annum;

10.    Objections to all of the contested claims will be sustained by the Court and/or Jaynes succeeds in the prosecution of the Bonded Stop Notice Claims and pays off all of the subcontractor claims in full; and

/ / /

33.

11.     That rents at the Oceanside Project  increases at 3% will begin by 2012.

As previously stated, Plan payments will come from the continued operation of the Debtor's businesses.  If the businesses generate insufficient funds to provide all of the Plan payments, then the Debtor will make up the shortfall under the following conditions and subject to the following terms: The Debtor will seek to refinance the Oceanside Project and his residence and/or the Debtor will seek to sell off his food business.  If refinancing efforts are unsuccessful, the Debtor will sell the Oceanside Project.  The Debtor's financial solvency, which is relevant to its ability to honor its commitment to make up any shortfall, is demonstrated by the following facts:

1.     The Cash Flow projections show the Debtor's ability to honor the payment provisions of the Plan.

2.     The income at the Oceanside Project will be able to cover the payments under the Plan once the rents have stabilized and rent increases take effect in 2012.

3.     The Debtor will employ all of the Lone Oak priming loan proceeds to fund TIs, to pay brokers' commissions, and operate the Oceanside Project.

## XVII.  SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND LEASES; OTHER PROVISIONS

The Plan provides for the following: The Debtor will assume his vehicle contracts/leases and he will retain his interest in the Oceanside Center, his residence, and FoodUSA and will assume his employment contract with FoodUSA.

As part of the Plan the Debtor will: (1) take title to the assets and related liabilities of the Oceanside Project in an LLC which is to be formed post plan confirmation; and (2) title to the Debtor's house will be transferred to the Debtor's wife.

The Court must make certain findings of fact before approving the aforementioned provisions as part of the Plan.  The Debtor will request that the Court make the

/ / /

34.

1 appropriate findings at the confirmation hearing, based upon evidence submitted in

2 support of the confirmation motion.

3

4 ## XVIII. <u>BANKRUPTCY PROCEEDINGS</u>

5     1.    The Debtor successfully obtained the Court's approval to use the cash

6 collateral of its primary secured creditor Oaktree through December 31, 2012 to continue

7 operating his primary asset, the commercial real property shopping and business center

8 located in Oceanside, California (hereinafter referred to as the "Oceanside Center").

9     2.    All professionals have been employed per Orders of the Bankruptcy Court,

10 with the Law Offices of James Andrew Hinds, Jr. having been employed by court Order

11 dated December 9, 2009, the Accountancy Firm of Dennis Murphy having been

12 employed by court Order dated December 9, 2009, Colliers International having been

13 employed to assist in leasing out additional space at the Oceanside Center by court

14 Order dated January 6, 2010, Robert M. Harding, President of Pacific Newport Builders,

15 Inc. having been employed by court Order dated June 6, 2010, and Promus Commercial

16 having been employed by court Order dated April 23, 2010.  The Debtor employed an

17 Appraiser with the Court's approval on February 4, 2010, to prepare a complete appraisal

18 of the Oceanside Center to aid the Debtor to obtain critical financing to complete tenant

19 improvements and thereby increase tenancy towards 100% capacity and to aid the

20 Debtor to obtain replacement financing to take out the Oaktree loan against the

21 Oceanside Center.  In December of 2010, the Debtor applied to employ the Law Offices

22 of Paul D. Kramer as his special local counsel to defend him in and potentially initiate and

23 prosecute construction litigation related to Tenant Improvements at the Oceanside

24 Project.  This application is still pending.

25     3.    The Debtor obtained Court approval of unsecured post-petition financing in

26 the amount of $130,000.00 on February 27, 2010 to allow the Debtor to complete a

27 portion of the remaining tenant improvements at the Oceanside Center.

28

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM
SHEIKH

4.     The Debtor successfully perfected a substantial damage claim against the Performance and Payment Bonds covering the construction of the Oceanside Center as a potential source of funding a settlement with his primary disputed creditors and a plan of reorganization.  While these claims have been resolved as part of the proposed Jaynes settlement the Debtor believes, in the exercise of his business discretion, that the settlement with Jaynes brings substantial value to the Estate and enhances the Estate's ability to survive the current economic crisis.

5.     The Debtor successfully removed to the Bankruptcy Court two state court actions involving his primary adversarial creditors as to the Oceanside Center, Oaktree, Jaynes Corporation of California (hereinafter referred to as "Jaynes Corp.").  In both of those adversaries, the Debtor has filed Cross-Complaint against both Oaktree/East West Bank and Jaynes.

6.     In the Sheikh/Jaynes matter, the parties settled their disputes and obtained the approval of the settlement from this Court.  As part of this settlement the parties resolved the amount owed by the Debtor under the Construction Contract, the parties resolved the Estate's liquidated damages claims against Jaynes under the Construction Contract, the parties allowed on how to complete construction at the Oceanside Project, so that the Debtor can obtain Final Certificates of Occupancy, the Agreement provides for payment of the claims of subcontractors and removal of all mechanics' liens asserted by Jaynes and its subcontractors against the Oceanside Project, and allows Jaynes to prosecute its claims against East West Bank in the San Diego Superior Court at no cost to the Estate.

7.     In the Sheikh/Oaktree matter, the parties obtained Court approval of a settlement of their disputes and differences which resulted in the dismissal of the claims held by the Estate against Oaktree (only) as asserted as part of the pending Adversary Proceeding filed before this Court, withdrawal of the Notice of Default recorded against the Oceanside Project, the approval of use of cash collateral, provision for mini-

36.

permanent financing for the Debtor through December 31, 2012, allowance of priming

financing of up to $600,000.00 to complete the TIs and compensation the brokers and

professionals in the case, and allowance of the Oaktree secured claim.  The parties

agreed that Oaktree will provide the Debtor with mini-permanent financing for the

Oceanside Project through December 31, 2012 upon certain terms and conditions set

forth in the Oaktree-Stipulation and the related Orders entered by this Court.  This

Agreement also provides that Oaktree will vote in favor of the Debtor's Plan so long as

the Debtor is current on his payments and not in default under the terms of the Oaktree-

Stipulation.

8.    The Debtor has on file his Objection to the Proof of Claim filed by Oaktree,

which claim objection has been withdrawn as part of the October 1, 2010-Order.

8.    The Debtor has on file his Objection to the Proof of Claim filed by Jaynes,

which claim objection has been withdrawn as part of the December settlement of the

Jaynes claim.

9.    The Debtor has filed claim objections to several claims as set forth above.

The Court has approved several of the Claim Objections thus striking several claims from

the official Claim Docket in the case and denying these creditors a vote on the Plan.  As

to three claims, the parties have agreed that these objected-to claim will be deemed to be

contested claims and the claim holders will not be allowed to vote on the Plan unless

otherwise Ordered by the Court.

9.    In October of 2010, the Debtor negotiated for and obtained post-petition

priming financing of $600,000.00 from Lone Oak Fund.  The new loan funded in

December 2010.  The net funds obtained through the priming financing were employed to

pay for TIs at the Oceanside Project, to pay commissions for Colliers, and to advance the

project toward obtaining the required Final Certificates of Occupancy.

## XIX.    TAX CONSEQUENCES OF PLAN

1    1.    <u>Tax Consequences to Creditors</u>:  The income tax consequences to

2 creditors of the implementation of the Plan will depend, among other things, on the

3 consideration to be received by the creditor, whether the creditor reports income using

4 the accrual or cash method, and whether the creditor has taken a "bad debt" deduction or

5 worthless security deduction with respect to its claim.  No opinion of counsel or ruling

6 from the IRS will be sought or obtained, and it is not likely that an opinion or ruling could

7 be obtained on all issues if one were sought.  The Debtor will withhold all amounts

8 required by law to be withheld from payments to holders of claims.  In addition, such

9 holders may be required to provide certain tax information to the Debtor as a condition of

10 receiving distributions under the Plan.

11    2.    <u>Tax Consequences to the Estate</u>:  The corporate tax return for the year

12 ended December 31, 2009 shows that there is a federal Net Operating Loss (NOL)

13 carryforward of is unknown and a California Net Operating Loss (NOL) carryforward of is

14 unknown.  It is assumed for this Plan that these Net Operating Losses would offset any

15 potential gain from the sale of assets or from any net income generated during the term

16 of the bankruptcy.  Furthermore, under the insolvency exception under Section 108(c) of

17 the Internal Revenue Code, debt forgiveness would not be treated as income.  Hence, it

18 is assumed that there would be no tax consequence under the Plan.

19

20 **XX.    EFFECT OF CONFIRMATION OF PLAN**

21 **a.    General comments**

22    The provisions of a confirmed Plan bind the Debtor, any entity acquiring property

23 under the Plan, and any creditor, interest holder, or general partner of the Debtor, even

24 those who do not vote to accept the Plan.

25    The confirmation of the Plan vests all property of the Estate in the Debtor.

26    The automatic stay is lifted upon confirmation as to property of the Estate.

27 However, the stay continues to prohibit collection or enforcement of pre-petition claims

28

38.

1  against the Debtor or the Debtor's property until the date the Debtor receives a discharge,

2  if any.  If the Debtor does not seek a discharge, the discharge is deemed denied, and the

3  stay as to the Debtor and the Debtor's property terminates upon entry of the order

4  confirming the Plan.  In this case the Debtor is seeking a discharge of all unsecured

5  debts upon successful consummation of the Plan.

6

7  **b.    Discharge of liability for payment of debts; status of liens; equity security**

8  **holders**

9          Unless the Debtor is not entitled to receive a discharge pursuant to 11 U.S.C.A.

10  1141(d)(3) (West 2004), the debtor may obtain a discharge only upon specific order of

11  the Court.

12          A discharge does not discharge a debt excepted from discharge under 11

13  U.S.C.A. § 523 (West 2004 & Supp. 2006).  Additionally, confirmation of the Plan does

14  not discharge any debt provided for in the Plan until the Court grants a discharge on

15  completion of all payments under the Plan.  At any time after the confirmation of the Plan,

16  and after notice and a hearing, the Court may grant a discharge to the Debtor who has

17  not completed payments under the Plan if - (i) the value, as of the Effective Date of the

18  Plan, of property actually distributed under the Plan on account of each allowed

19  unsecured claim is not less than the amount that would have been paid on such claim if

20  the estate of the debtor had been liquidated under Chapter 7 on such date; and (ii)

21  modification of the Plan under section 1127 is not practicable, unless the Court finds that

22  there is no reasonable cause to believe that - (i) section 522(q)(1) may be applicable to

23  the Debtor; and (ii) there is pending any proceeding in which the Debtor may be found

24  guilty of a felony of the kind described in section 522(q)(1)(A) or liable for a debt of the

25  kind described in section 522(q)(1)(B).  See 11 U.S.C.A. § 522(q)(1)(A)-(B) (West Supp.

26  2006).

27  / / /

28

39.

**c.    Modification of the Plan**

The Debtor may modify the Plan pursuant to 11 U.S.C.A. § 1127 (West 2004 & Supp. 2006).

**d.    Post-Confirmation Causes of Action**

To the best knowledge of the Debtor, the Estate has the following causes of action: the Estate's claim against East West Bank for (1) Breach of Written Contract; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Promissory Fraud; (4) Declaratory Relief; claims against Jaynes Corporation of California for (1) Breach of Written Contract; (2) Declaratory Relief; (3) Specific Performance under Bonds; (4) Breach of the Covenant of Good Faith and Fair Dealing; and claims against the owners of Mimi's Nails for breach of contract; and potential claims against the design team and the architect for the development of the Oceanside Project.

Abdul Halim Sheikh is designated as representative of the Estate under 11 U.S.C.A. § 1123(b)(3) (West 2004) and shall have the right to assert any or all of the above causes of action post-confirmation in accordance with applicable law.

**e.    Final Decree**

Once the Plan has been consummated, a final decree may be entered upon motion of the Debtor.  The effect of the final decree is to close the bankruptcy case.  After such closure, a party seeking any type of relief relating to a Plan provision can seek such relief in a state court of general jurisdiction.

**XXI.    DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN**

I, Abdul Halim Sheikh, declare under penalty of perjury under the laws of the United States of America that the following statements are true and based upon personal knowledge.

/ / /

40.

1      1.    I am the individual who is the Debtor and Debtor-In-Possession who
2 assisted in the prepared this document.

3      2.    The source of all financial data is the Accountancy Firm of Dennis M.
4 Murphy and from my books and records.

5      3.    All facts and representations in the Plan and Disclosure Statement are true
6 to the best of my knowledge, information, and belief.

7      4.    No fact material to a claimant or equity security holder in voting to accept or
8 reject the proposed Plan has been omitted.

9      5.    The names of the persons who prepared the cash flow projections and the
10 other financial documents are Bonnie Huang and Dennis M. Murphy, CPA, CIRA, and
11 such persons were acting within the capacity of Accountants for the Debtor.

12     6.    The accounting method used to prepare the cash flow projections and the
13 other financial documents is the Cash Accounting method.

15 Date:   December 22, 2010

Abdul Halim Sheikh

18 PlanDisclosureStatement.v10.wpd

41.

FOURTH AMENDED DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR ABDUL HALIM SHEIKH

## BALLOT FOR ACCEPTING OR REJECTING PLAN

     Abdul Halim Sheikh filed a Plan of Reorganization on October 8, 2010, as modified by the First, Second, Third, and Fourth Amended Disclosure Statements filed in the month of December 2010.  By this ballot you will decide whether to accept or reject this Plan.

     The Plan referred to in this ballot can be confirmed by the Court and thereby bind you if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class and the holders of two-thirds in amount of equity security interests in each class voting on the Plan.

     If the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if the Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of 11 U.S.C.A. § 1129(b) (West 2004 & Supp. 2006).

     Check the appropriate line below, which describes your interest:

_____ The undersigned, a creditor with an allowed claim in the amount of $_____:

_____ The undersigned, the holder of _____ shares of _____ (explain type of stock) stock, with a certificate(s) No. _____:

[  ] Accepts the Plan

[  ] Rejects the Plan

Print or type name: _____

State which class you are a member of: _____

Signed:      _____

If appropriate, by: _____  as  _____

Address:

     Return this ballot on or before January 25, 2011 to Hanna B. Raanan, Esq., The Law Offices of James Andrew Hinds, Jr., 21515 Hawthorne Blvd., Suite 1150, Torrance, CA 90503.